**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| ERIN THEOBALD, | Case No. 1:17-cv-688 |
| Plaintiff, | Barrett, J.<br>Bowman, M.J. |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

Plaintiff Erin Theobald filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

In September 2013, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), originally alleging disability beginning January 30, 2012, but subsequently amended to January 1, 2014.[1] (Tr. 44). Plaintiff claims she is disabled primarily based upon bowel and bladder-related physical impairments, fibromyalgia, degenerative disc disease, and nerve damage in her upper extremities. After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an

---

[1]At the hearing, counsel referred to Plaintiff's Date Last Insured as September 30, 2014. (Tr. 44). However, based upon her SGA earnings record, the ALJ found Plaintiff remains insured through December 31, 2018. (Tr. 16).

1

administrative law judge ("ALJ"). On April 5, 2016, she appeared with counsel and gave testimony before ALJ Billy Thomas; a vocational expert also testified. (Tr. 32-56). On June 16, 2016, ALJ Thomas issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 14-25).

Plaintiff was 54 (closely approaching advanced age) on her disability onset date and had changed to the advanced age category, at 57 years old, at the time of the ALJ's decision. She lives with her husband and elderly mother and has past relevant work as a medical transcriptionist which she performed at substantial gainful work ("SGA") levels through 2013.[2]

The ALJ specifically determined that Plaintiff suffers from the following severe impairments: "interstitial cystitis, irritable bowel syndrome, fibromyalgia, and degenerative disc disease of the thoracic and lumbar spine." (Tr. 16). In addition to those severe impairments, the ALJ considered, but classified as non-severe, Plaintiff's complaints of weakness in her hands, depression and anxiety. (Tr. 17). Pertinent to this appeal,[3] the ALJ found that the evidence to support the testimony of upper extremity limitations to be "exceedingly limited, with the claimant receiving little documented treatment for symptoms associated with her carpel tunnel syndrome or ulnar neuritis." (*Id.*)

The ALJ next determined that none of Plaintiff's impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 19).

---

[2]Plaintiff's continued ability to work at SGA levels led her to amend her onset date to January 1, 2014 at the hearing.
[3]Plaintiff does not here challenge the determination that her mental impairments were not severe.

2

Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform work at a sedentary level, subject to the following limitations:

> [S]he must be permitted to change position every hour. She can never climb ladders, ropes, or scaffolds, can only occasionally stoop, and can only frequently kneel, crouch, crawl, and climb ramps and stairs. Moreover, she must avoid all exposure to hazards, extreme cold, and vibration.

(Tr. 19). Based upon the testimony of the vocational expert, the ALJ found that Plaintiff could perform her past job and therefore was not disabled. The Appeals Council denied review, leading Plaintiff to file this judicial appeal.

In her Statement of Errors, Plaintiff argues that the ALJ erred by: (1) failing to find severe upper extremity impairments and/or limitations; (2) assigning little weight to the opinion of a treating physician; and (3) negatively assessing Plaintiff's credibility.

**II. Analysis**

**A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole.

3

*Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an

4

impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B. Plaintiff's Claims of Error

### 1. Upper Extremity Impairments or Limitations

Plaintiff argues first that reversal is required because the ALJ failed to find any "severe" upper extremity impairments or limitations. She points to an EMG dated on July 31, 2007, many years prior to her alleged 2014 onset of disability, in which an EMG test revealed "Incomplete Bilateral Ulnar Nerve Lesion[s]" at the elbows as well as a mild, right median nerve lesion at the wrist. (Tr. 479-481). The same EMG study revealed many normal findings. For example, a needle EMG of several muscles in both upper extremities was normal, including the cervical paraspinal muscles, reflecting no cervical radiculopathy. (Tr. 480; *see also* Tr. 709). The examining physician also found full range of motion in the shoulders, elbows and wrists, and noted a normal sensory examination, despite numbness in her wrists and moderate decrease in sensation in both hands. He diagnosed mild carpal tunnel syndrome for which he recommended surgical release on the right side. (Tr. 709). Plaintiff elected not to undergo surgery, choosing physical therapy instead and continuing to work full-time with software she purchased to reduce the amount of typing required in her job.

Plaintiff argues that the long-ago EMG test remains "probative evidence of the claimant's upper extremity impairments." (Doc. 5 at 3). She also points to a follow-up examination in June 2015 in which an orthopedist, Dr. Thomas, recorded complaints of right elbow pain and numbness. However, Dr. Thomas noted that despite similar complaints back in 2007, she had responded favorably to conservative treatment at that time. "[S]he *did very well until 6 to 8 months ago* when symptoms recurred" and in 2015,

continued to work as a transcriptionist. (Tr. 705, emphasis added). She "attributed recurrence to sleeping position…." (*Id.*) On exam, Dr. Thomas found tenderness to palpation over the ulnar nerve, obvious subluxation of the ulnar nerve, and a positive Tinel's sign consistent with ulnar neuritis on the right side. (Tr. 707). However, he also found intact strength, full range of motion, and a negative criss-cross test.[4] (Tr. 707). In 2015, he recommended only conservative treatment with Plaintiff to follow-up "if needed" in six weeks. (Tr. 51; *see also* Tr. 707).

In August 2015, Plaintiff saw Christopher Diatte, M.D., a primary care physician who made normal findings including full strength throughout her extremities. (Tr. 716-717).

As stated, Plaintiff worked as a transcriptionist at SGA levels from 2007 through 2013. At the hearing, however, Plaintiff testified that she had "noticed quite a weakness in my hands with trying to maneuver opening a jar, buttoning something, zipping something," and "feel like I drop things more." (Tr. 44). Relevant to her past work, Plaintiff testified that she had "gradually" decreased the amount of typing she performed as a medical transcriptionist since her 2007 diagnoses and invested in Dragon software to reduce the amount of typing. (Tr. 44-45).

Plaintiff complains that the ALJ erred at Step 2 of the sequential analysis by failing to find any "severe" upper extremity impairment, and further erred by failing to incorporate associated limitations into her RFC. I find no error. First, so long as an ALJ finds a claimant has at least one severe impairment at Step 2 and proceeds to the next steps of the sequential analysis, the "question of whether the ALJ characterized any other alleged

---

[4]The criss-cross test measures the function of the ulnar nerve by having the patient cross his middle finger over the index finger. (Doc. 6 at 9, n.5, citing https://www.ncbi.nlm.nih.gov/pubmed/7430600).

impairment as severe or not severe is of little consequence." *Pompa v. Com'r of Soc. Sec.*, 73 Fed. Appx. 801, 8032 (6th Cir. 2003); *see also generally Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987).

Second, as the ALJ explained, the only diagnostic testing – the 2007 EMG – was very remote in time to Plaintiff's alleged onset date in 2014. Although some abnormalities were found in 2007, Plaintiff had full range of motion in her shoulders, elbows and wrists. (Tr. 709). Plaintiff's complaints appear to have resolved with physical therapy in 2007. She chose not to pursue surgical release of her carpal tunnel syndrome and was able to continue working full-time as a transcriptionist notwithstanding her testimony that she purchased software to reduce the amount of typing required. For more than five years after her 2007 diagnoses up until October 2012 when she was evaluated by Dr. Portugal for complaints of intermittent back pain, Plaintiff made no hand complaints at all. And although she briefly complained of radiating numbness to Dr. Portugal (Tr. 370), he found no abnormalities in Plaintiff's use of her hands or arms and declared Plaintiff to be "neurologically stable." (Tr. 376-377).

Records after her 2014 alleged onset date also do not support reversal of the ALJ's determination that Plaintiff had no upper-extremity work-related limitations. For example, during a consultative examination in January 2014 by Dr. Ray, he found normal grip strength, manipulation ability, and sensation and opined that Plaintiff could "handle objects without difficulty." (Tr. 446). In May 2014, Dr. Ross also noted no relevant abnormal findings. (Tr. 702-703). And in August 2015, Dr. Diatte again found full strength in Plaintiff's extremities and no abnormalities. (Tr. 716-717). Notwithstanding Plaintiff's isolated new complaint to Dr. Thomas in June 2015, he recommended only conservative treatment. In short, given the lack of evidence to support any arm or hand limitations

7

whatsoever after Plaintiff's alleged onset date and the consistent longitudinal evidence that supports the absence of such limitations, the ALJ's decision not to include upper extremity limitations is substantially supported.

In her reply memorandum, Plaintiff argues that there is "no evidence that the ALJ considered" her alleged ulnar neuritis and mild right carpal tunnel syndrome at Steps 4 and 5, because his only explicit discussion was at Step 2. (Doc. 8 at 1). Plaintiff implies (without citation to any evidence) that her decision not to pursue surgical intervention in 2007 left the conditions unabated more than eight years later. To the contrary, even Plaintiff endorsed symptoms only "off and on" over the past 10 years. (Tr. 51). The records reflect resolution of Plaintiff's symptoms in 2007, a single fleeting complaint in October 2012, and one additional complaint in June 2015.

Plaintiff also points to her testimony that her physician advised her to type less back in 2007, and that she complied with that advice by purchasing specialized software. However, the record as a whole strongly supports the ALJ's determination that - whatever the status of Plaintiff's previously diagnosed ulnar neuritis and/or carpal tunnel syndrome from 2007 until January 2014[5] - she had no associated limitations after her alleged onset of disability that precluded full-time work. In formulating a plaintiff's RFC, there is no regulatory requirement that an ALJ separately discuss every non-severe impairment as to which the ALJ has found <u>no</u> work-related limitations. It is sufficient for the ALJ to state on the record that he has "considered <u>all</u> symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence," as the ALJ did in this case. (Tr. 19, emphasis added). *Accord Ditz v. Com'r*

---

[5]Many medical conditions including but not limited to conditions involving inflammation and nerve impingement resolve over time.

8

*of Soc. Sec.*, 2009 WL 440641 at *3 (E.D. Mich. Feb. 20, 2009) (no reversible error where ALJ found ulnar nerve compression to be non-severe and failed to include any related restrictions, despite some evidence that her doctor had advised her to avoid leaning on her elbow during a time when she was working).

### 2. Evaluation of a Treating Physician's Opinions

Plaintiff's second claim is that the ALJ erred by assigning little weight to the RFC opinions of the urogynecologist, Dr. Crisp, who began treating Plaintiff for her chronic and longstanding Interstitial Cystitis ("IC") on May 30, 2013, seven months prior to her alleged disability onset date. A long-standing regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it <u>controlling</u> weight." 20 C.F.R. §404.1527(c)(2) (emphasis added); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p.[6] An ALJ must provide "good reasons" if he does not give controlling weight to the opinion of a treating physician. *Id.*

Before turning to Dr. Crisp's opinions, it must be noted that the bulk of Plaintiff's medical records concern her ongoing treatment for various bladder and bowel issues, including but not limited to IC. The ALJ summarized those records in chronological fashion, beginning in January 2014 and continuing through the date of his decision:

> Medical documents recounting her history of treatment prior to her January 2014 amended alleged onset date indicated her receipt of urethral dilations

---

[6]A new rule set forth in 20 C.F.R. §404.1520c replaces the treating physician rule previously set forth in 20 C.F.R. § 404.1527. However, based upon the date of Plaintiff's DIB application in this case, the prior rule and related case law continue to apply. *Accord, Glanz v. Com'r of Soc. Sec.*, 2018 WL 3722318 at n. 5 (N.D. Ohio July 17, 2018).

9

> and hydrodistension, as well as bladder instillations during this period, as well as her complaints of frequent flares of right upper quadrant pain, nausea, and vomiting…. Notably, however, they also reveal the claimant's submission to a December 2013 gallbladder removal that had reportedly relieved "70%" of these symptoms by April 2014….
>
> Nevertheless, the claimant continued to undergo regular bladder instillations as her purported disability began, citing little relief from her symptoms of "constant" pelvis achiness and feelings of incomplete emptying during hits period…. By early April 2014, the claimant's treating urologist recommended that she engage in an intensive course of weekly bladder instillations, physical therapy, and ongoing dietary maintenance…. Records…indicate her use of prescribed Percocet for pain, yet revealed that she was then only taking a half-tablet two times per day for pain….

(Tr. 21).

The ALJ pointed out that as Plaintiff underwent treatment, she reported improvement, and by the end of April 2014, was walking 2 miles per day. (Tr. 21). Physical examination during the same timeframe "returned normal results, even as the claimant reported in May [2014] that she had struggled to comply with her dietary management over recent weeks." (*Id.*) Plaintiff did not return to treatment again until December 2014, and subsequent records starting in March 2015 noted that she was "doing very well with instillations." (Tr. 22; Tr. 884).[7] She had no acute complaints or abnormal physical findings in 2015 treatment notes. By December 2015, treatment notes reflected she continued to do "very well" and had "not had a flare-up since July." (*Id.*) More recent 2016 records similarly reflected that she continued to do "very well" in treatment, despite one flare triggered by "dietary cheats over the holiday." (Tr. 22). Plaintiff's physical exam was normal but vaginal Valium was prescribed to control

---

[7]Treatment for IC includes lifestyle changes such as diet and exercise, bladder and bowel training, physical therapy, medicines, and bladder instillation. During an instillation, a physician administers a small amount of liquid medicine into the bladder with a catheter. The liquid is kept in the bladder for 10-15 minutes. See, e.g., https://www.niddk.nih.gov/health-information/urologic-diseases/interstitial-cystitis-painful-bladder-syndrome/treatment (accessed on 12/6/18).

reported pelvic and bladder spasms. Plaintiff reported that she continued to take no more than one Percocet per day, even though her prescription permits her up to two per day. (*id.*; *see also* Tr. 50, testimony that she "usually" takes some Percocet daily, but typically only a half pill twice per day).

Prior to evaluating Dr. Crisp's opinions, the ALJ also considered Plaintiff's daily activity level. Plaintiff reported that she spent her days with her grandchildren, lunching with friends, and grocery shopping. She continues to drive, performs household chores including laundry, making beds and doing dishes, and prepares meals for herself and her family. She is independent with personal grooming and hygiene, attends regular Bible studies, and worked at reduced levels throughout her purported disability period, with income reported through the end of 2015. She reported to Dr. Ray in 2014 that she enjoys reading, watching television, church outings, and watching movies, but has had to decrease the amount of biking and hiking she does. (Tr. 445).

Despite the fact that Dr. Crisp's treatment notes reflect good results from her treatment of Plaintiff's longstanding IC, Dr. Crisp completed a "Medical Assessment" form on March 17, 2016 in which she opined that Plaintiff's IC causes work-preclusive limitations. For example, Dr. Crisp opined that Plaintiff could lift not more than 5 pounds, could stand for no more than 2 hours total (and not more than 20 minutes at a time), and also could sit for no more than 2 hours (and not more than 45 minutes at a time). She further opined that Plaintiff had reaching restrictions, would be off task 75-100% of the workday, and would miss "more than 10-15 days per month at least with others interrupted and requiring her to leave work." (Tr. 721-726).

The ALJ reasonably rejected these extreme opinions, concluding that they were not entitled to controlling weight under applicable regulations because they were not well-supported and were inconsistent with substantial evidence in the record:

> The undersigned finds the limitations proposed by Dr. Crisp [to be] grossly overstated and at odds with the objective and treatment evidence made available – including, but not limited to, her own records of care that suggested the claimant's favorable response to treatment. This source advised that the claimant could, inter alia, stand, sit, and walk for no more than a total combined 4 hours throughout a standard 8-hour workday, could never engage in balancing, crouching, or crawling activities, would miss more than 4 days of work each month, and would be off-task for 75-100% of the workday secondary to pain. Nothing in the available records supports such limitations, least of all the claimant's self-reported activities of daily living, which far exceed Dr. Crisp's suggested restrictions. Moreover, this professional offers no objective support for such drastic limitations, citing nothing aside from the claimant's experience of subjective pain in support of her proposals. Finally, the undersigned notes that Dr. Crisp's proposal that the claimant is limited to occasional reaching bears no rational relationship to any of the diagnosed impairments she treated.
>
> In finding Dr. Crisp's opinions entitled to little weight, the undersigned remains mindful of the requirements of the Regulations given her role as the claimant's treating source. Initially, her opinion is not entitled to controlling weight, as her views remain unsupported by medically acceptable clinical and laboratory diagnostic techniques and stand inconsistent with the views of Dr. Ray and the state agency professionals.

(Tr. 24).

Plaintiff maintains that because her IC "progressively worsened" over the years since her original diagnosis in 2004, the ALJ should have given greater weight to Dr. Crisp's RFC opinions. Plaintiff further argues that reversal is required because the ALJ failed to cite SSR 15-1p, which provides guidance on the evaluation of IC. *Id.*, 2015 WL 1292257 (S.S.A. March 18, 2015), as corrected at 2015 WL 1642778 (S.S.A. April 9, 2015). However, an ALJ's failure to cite to a social security ruling will never constitute reversible error, as "the ultimate issue is not whether the ALJ included a rote citation, but whether he complied with the regulatory scheme." *Cain v. Com'r of Soc. Sec.*, 2016 WL

8604322, at *4 (S.D. Ohio, 2016), adopted at. 2017 WL 1102681 (S.D. Ohio, 2017); *see also Allen v. Com'r of Soc. Sec.*, 2016 WL 6471092, at *3 (W.D. Mich., 2016). "'While SSR's do not have the force of law, they are an agency's interpretation of its own regulations and "entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation."'" *Id.*, citing *Kornecky v. Com'r of Soc. Sec.*, 167 Fed. Appx. 496, 498 (6th Cir. 2006). Here, the record supports the ALJ's evaluation of the degree of limitation caused by Plaintiff's IC, including the intensity, persistence, and limiting effects of her condition. *Contrast Chavis v. Astrue*, 2012 WL 5306130 (S.D. Ohio Oct 26, 2012) (remanding where ALJ not only failed to cite SSR, but failed to include *any discussion at all* of plaintiff's IC, including discussion of the intensity, persistence and limiting effects of that condition).

SSR 15-1p makes clear that "we cannot determine that a person who has IC is disabled on the basis of his or her statement of symptoms alone." *Id.*, 2015 WL 1292257, at *2. Instead, SSR 15-1p explains that IC is a "complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region." The ruling defines IC as: "An unpleasant sensation (pain, pressure, discomfort) perceived to be related to the urinary bladder, associated with lower urinary tract symptoms of more than six weeks duration, in the absence of infection or other identifiable causes." *Id.* at *2. Symptoms vary in both kind and intensity. *Id.* As with fibromyalgia and other complex disorders, SSR 15-1p emphasizes the need to evaluate longitudinal evidence "because symptoms, signs, and laboratory findings of IC may fluctuate in frequency and severity and may continue over a period of months or years." *Id.*

> Longitudinal clinical records reflecting ongoing medical evaluation and treatment from the person's medical sources, especially treating sources, are extremely helpful in documenting the presence of any signs or laboratory findings, as well as the person's limitations over time. The

13

longitudinal record should contain medical observations, information about treatment, the person's response to treatment, and a detailed description of how the impairment affects the person's ability to function.

*Id.*, at *5.

The ALJ's opinion reflects careful analysis of the longitudinal evidence, which strongly supports the ALJ's assessment of Plaintiff's RFC and does not support Dr. Crisp's extreme limitations concerning her IC condition or pain related to any other condition. Based on review of the same records, including records cited by Plaintiff on appeal, the undersigned finds no basis to disturb the ALJ's substantially supported and appropriately articulated "good reasons" for rejecting Dr. Crisp's unsupported opinions.

### 3. The ALJ's Adverse Credibility Assessment

Plaintiff's third claim challenges the ALJ's adverse credibility determination. In formulating Plaintiff's RFC, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 20).

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

In addition to considering Plaintiff's daily activity level in the context of evaluating Dr. Crisp's opinions, the ALJ considered her activity level in assessing her subjective complaints. As stated, Plaintiff reported spending her days with her grandchildren, lunching with friends, and grocery shopping. She drives, performs a multitude of

household chores, is independent with personal grooming and hygiene, and attends regular Bible studies. She continued to work at an SGA level through 2013 and worked at reduced levels after that with income reported through the end of 2015.

Plaintiff maintains that the fact that she continued to work at reduced levels after her alleged onset date should have been viewed as evidence that supported her claim rather than as undermining her subjective complaints. She argues that the record shows that she continued to try to work and only gradually decreased her hours until she no longer continue at an SGA level. However, the undersigned finds no basis for disturbing the credibility assessment in this case. Some facts, such as Plaintiff's continued participation in work activity, are subject to more than one interpretation. While Plaintiff's continued part-time employment *could* be interpreted as supporting her claim,[8] it was not unreasonable for the ALJ to view that same fact as undermining Plaintiff's claim, particularly in light of many other inconsistencies in the record.

In support of the adverse credibility finding, the ALJ pointed out many objective testing and treatment records that did not fully support Plaintiff's subjective complaints, including minimal evidence to support any impairment from fibromyalgia. (Tr. 20). Her lack of longitudinal treatment for her back condition and routinely normal physical exams likewise were inconsistent with her claim. (*Id.*) At a consultative examination in January 2014, she advised she experienced only "intermittent" back pain that had successfully resolved with physical therapy and Robaxin. (*Id.*) Plaintiff testified at the hearing that she

---

[8]Plaintiff's testimony concerning the reasons for reducing her hours was equivocal. Although she testified in part that she reduced her hours due to alleged hand limitations, she also testified that the Dragon software allowed her to continue in her job, and that a dramatic reduction in her workload in 2012 was attributable to her employer losing business because medical transcription services were "taken in-house in the hospitals" at that time. (Tr. 44-45).

could comfortably lift and carry no more than 5 to 10 pounds, sit for only 20-30 minutes and stand for the same time, and that she could not walk more than 30 minutes. However, the ALJ pointed out that her "recent testimony diverges from her previous statement to examining sources, where she advised of her ability to lift up to 20 pounds, sit for up to an hour, and walk for up to 2 miles at a time." (*Id.*; *see also* Tr. 445). And both treating and examining sources "regularly remarked upon her normal range of motion and negative straight leg raises, as well as her full strength, sensation, and reflexes. (Tr. 21). With regard to pain management, Plaintiff visited a pain management specialist only once in 2014 and received mostly conservative care consisting of "as needed" Percocet and recommendations for heat, ice, and exercise. (*Id.*)

Plaintiff's assertion that she was disabled due to her bowel and bladder issues was inconsistent with records that reflected "70%" relief of her symptoms following December 2013 gallbladder surgery, a few months prior to her alleged onset of disability. Although she continued to undergo regular bladder instillations as a form of treatment in 2014 and 2015, citing "constant" pelvic achiness and feelings of incomplete emptying, the records do not support her allegations of extreme and disabling pain or functional limitations beyond those determined by the ALJ. She was prescribed Percocet but took only a half-tablet twice daily and advised her treating physicians of improvements after April 2014. The post-DLI evidence indicated she continued to do "very well" with treatments, with no more than "moderate" self-reported symptoms (Tr. 22). In fact, at her consultative examination in January 2014, she reported her pelvic and bladder-related pain was at no more than a "1 or 2" on a standard pain scale, with levels reaching only a "6" with acute flare-ups. (*Id.*; Tr. 444).

16

Many people suffer from chronic pain that does not disable them from all work. The ALJ's decision not to fully credit Plaintiff's complaints of disabling pain in this case is amply supported by the record.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

/s Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ERIN THEOBALD,                                         Case No. 1:17-cv-688

          Plaintiff,                             Barrett, J.
                                                          Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).